## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JOSHUA GREENBERG**<br>1510 Park Avenue<br>Baltimore, Maryland 21217 | * |
| | * |
| *Plaintiff* | |
| | * |
| **v.** | |
| | * |
| **MAYOR AND CITY COUNCIL OF**<br>**BALTIMORE** | * |
| SERVE ON ACTING CITY SOLICITOR:<br>Ebony Thompson<br>100 N. Holliday Street, Suite 101<br>Baltimore, Maryland 21202 | * |
| | * |
| **AND** | |
| | * |
| **OFFICER MEGAN DEATON**<br>SERVE ON: | * |
| Baltimore City Police Department<br>242 W. 29th Street<br>Baltimore, Maryland 21211 | * |
| | * |
| **OFFICER LATORA CRAIG**<br>SERVE ON: | * |
| Baltimore City Police Department<br>242 W. 29th Street<br>Baltimore, Maryland 21211 | * |
| | * |
| **OFFICER KRYSTAL COOPER**<br>SERVE ON: | * |
| Baltimore City Police Department<br>242 W. 29th Street<br>Baltimore, Maryland 21211 | * |
| | * |
| *Defendants* | |

**CASE NO.:**

\* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Joshua Greenberg, by and through his attorneys, Allen E.

Honick and Dustin C. Furman of FURMAN | HONICK LAW, and hereby sues the Defendants, Mayor

and City Council of Baltimore, Officer Megan Deaton, Officer Latora Craig, and Officer Krystal Cooper, and, as grounds, states the following.

**PARTIES**

1.     Plaintiff Joshua Greenberg ("Mr. Greenberg") is and was at all relevant times a natural person and an adult resident of Baltimore City, Maryland, and the owner and sole member of both Greenberg Law, LLC and Greenberg Consumer Law, LLC (collectively the "Greenberg Law Firm").

2.     Defendant Mayor and City Council of Baltimore ("Baltimore City" or "the City") is and was at all relevant times a municipal corporation created and operating under the laws of the State of Maryland. Effective January 1, 2023, following voter approval of a City Charter amendment in November 2022, the Baltimore City Police Department ("BPD") became an agency and instrumentality of the City, subject to its full control, funding, and oversight. Baltimore City, by and through BPD, is responsible for, *inter alia*, responding to emergencies, conducting criminal investigations, assisting in criminal prosecutions, and establishing policies, training, supervision, and discipline for BPD officers.

   a. At all times relevant to this action, the Police Commissioner of the Baltimore Police Department was the final policymaker for Baltimore City with respect to policies governing arrests, warrant applications, probable cause determinations, officer discipline, officer training, and supervisory review of charging documents.

   b. The Police Commissioner and senior command staff are responsible for establishing, approving, implementing, and enforcing policies concerning the preparation and review of probable cause affidavits and Applications for Statement of Charges.

    c. The Police Commissioner and City leadership receive regular reports concerning arrest declination rates, judicial findings of lack of probable cause, civil rights lawsuits, settlement payments, internal investigations, and compliance reports issued pursuant to the federal consent decree.

    d. Despite actual and constructive knowledge of widespread constitutional violations involving fabricated probable cause affidavits and unlawful arrests, final policymakers failed to implement adequate corrective measures, retraining, supervision, auditing, or discipline sufficient to prevent recurrence.

    e. The policies, customs, and practices described herein are therefore attributable to Baltimore City through its final policymakers. The Police Commissioner's decisions regarding training, supervision, discipline, and affidavit-review protocols constitute official municipal policy for purposes of 42 U.S.C. § 1983.

3. On information and belief, Defendant Megan Deaton ("Officer Deaton") is and was at all relevant times a natural person, an adult resident of Baltimore City, Maryland, and an active-duty police officer with BPD acting within the scope of her employment with the City.

4. On information and belief, Defendant Latora Craig ("Officer Craig") is and was at all relevant times a natural person, an adult resident of Baltimore City, Maryland, and an active-duty police officer with BPD acting within the scope of her employment with the City.

5. On information and belief, Defendant Krystal Cooper ("Officer Cooper," and together with officers Deaton and Craig, the "Officer Defendants") is and was at all relevant times a natural person, an adult resident of Baltimore City, Maryland, and an active-duty police officer with BPD acting within the scope of her employment with the City.

6. The Officer Defendants are sued in their individual capacities.

## JURISDICTION AND VENUE

7.    This Court possesses personal jurisdiction over Defendant Baltimore City pursuant to Fed. R. Civ. P. 4(k) and Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 6-102(a).

8.    This Court possesses personal jurisdiction over the Officer Defendants pursuant to Fed. R. Civ. P. 4(k) and Md. Code Ann., CJP § 6-102(a), as the Officer Defendants are domiciled in the State of Maryland.

9.    This Court possesses original subject matter jurisdiction over Counts I–II pursuant to 28 U.S.C. § 1331, as said Counts arise under the Constitution, laws, and/or treaties of the United States of America.

10.    This Court possesses supplemental subject matter jurisdiction over Counts III–X of this action pursuant to 28 U.S.C. § 1367(a), as said Counts arise from the same case or controversy as the Counts of original jurisdiction.

11.    Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(1), as all Defendants are residents of the State of Maryland and at least one Defendant resides within the judicial district of this Court.

12.    Pursuant to Md. Code, CJP § 5-304(b), notice of this action was timely provided to Defendant Baltimore City on October 06, 2023 – within one (1) year of the conduct giving rise to this action.

13.    Pursuant to Md. Code, CJP § 5-304(c)(3)(i), notice of this action was sent via certified mail, return receipt requested, to the Acting Baltimore City Solicitor, Ms. Ebony Thompson, Esq.

## INTRODUCTION

14.    This action arises from a false arrest and malicious prosecution, stemming from an admittedly baseless criminal accusation, which resulted in a police raid at Mr. Greenberg's home on February 24, 2023, at approximately 2:30 a.m. Based on Defendant Deaton's knowingly false affidavit and application for a statement of charges—part of BPD's entrenched pattern of fabricating probable cause, as evidenced by decades of similar misconduct, federal findings of deliberate indifference, and massive settlements—Mr. Greenberg was charged with thirteen (13) unsubstantiated offenses, including three (3) felonies, which were all eventually nolle prossed, but not before inflicting irreversible harm.

15.    Officer Deaton subsequently admitted, under oath, that her factual averments in the application for statement of charges against Mr. Greenberg were untrue and, in fact, did not occur as she previously swore under the penalties of perjury. By the time Officer Deaton admitted that she had fabricated her allegations in the sworn application, Mr. Greenberg had been arrested, held without bond, and charged with several serious offenses, thus jeopardizing his reputation, livelihood, and freedom. Yet, Deaton refused to amend the charging documents or correct the record even after her sworn admission of falsity, and despite knowing that her failure to correct the record would lead to additional irreparable harm.

16.    When news of the raid, the criminal charges, and his detainment without bond became public, Mr. Greenberg's partners and clients began withdrawing their business from his law firm. While some clients indicated that they could tolerate a brief interruption to Mr. Greenberg's services, the prolonged pendency of the baseless felony charges—persisting for over five months until the July 26, 2023 nolle prosequi—caused catastrophic and irreversible loss to

the business, as clients and partners could not abide the ongoing uncertainty and reputational stain from the pending criminal charges.

17.     As a result, Mr. Greenberg was forced to sell the Greenberg Law Firm, with urgency, to avoid breaching his statutory and ethical duties to his existing clients, to avoid further reputational harm to the business, and to mitigate the damages already caused by the Defendants' conduct.

18.     The Defendants' conduct, individually and collectively, deprived Mr. Greenberg of substantial commercial profits that he would have received but for the Defendants' conduct – i.e., conducting a baseless police raid, falsely arresting Mr. Greenberg without a sufficient factual basis, fabricating criminal allegations against Mr. Greenberg, and refusing to amend his charging documents or correct the record even after Defendant Deaton's sworn admission of falsity. Mr. Greenberg's business and professional reputation were irreversibly ruined by the Defendants' conduct and have never recovered.

19.     Sadly, this incident did not occur in isolation. Baltimore City, through its police department, has maintained a longstanding pattern and practice of ratifying and/or condoning the unconstitutional conduct of its officers, and/or BPD's deliberate indifference to its failure to train and supervise its officers regarding probable cause determinations, affidavit accuracy, and post-arrest verification. Furthermore, BPD fails to properly discipline, as a matter of internal policy, officers who perform false arrests based on fabricated allegations, such that BPD has knowingly, or with deliberate indifference, acquiesced to the unconstitutional conduct described herein. BPD's pattern and practice of this unconstitutional conduct dates back over ten (10) years and continues to persist despite federal intervention. These systematic municipal failures were the moving force

behind Mr. Greenberg's injuries, including but not limited to his deprivation of liberty, wrongful arrest and incarceration, lost wages, reputational harm, and severe emotional distress.

## FACTS COMMON TO ALL COUNTS

20.     The facts underlying the Officer Defendants' conduct toward Mr. Greenberg are detailed below and in the remaining paragraphs of this Complaint. In summary, on or about February 24, 2023, Officer Deaton fabricated allegations in an affidavit claiming that Mr. Greenberg pointed a gun at police officers, despite knowing these events did not occur as described. Officers Craig and Cooper assisted in the raid and arrest without independently verifying probable cause, in violation of the Fourth Amendment.

21.     This conduct was caused by Baltimore City's policies, customs, and practices, as follows:

a.  **Persistent and Widespread Custom of Fabricating Probable Cause**: BPD has a documented pattern of officers submitting false affidavits and making arrests without probable cause. For example, the U.S. Department of Justice's August 10, 2016 report ("DOJ Report") on BPD found a "pattern or practice" of unconstitutional stops, searches, and arrests, including the use of "template" affidavits with boilerplate language lacking individualized facts, leading to invalid warrants and false arrests. The DOJ Report cited numerous instances where BPD officers fabricated evidence or probable cause, such as planting drugs or weapons, and noted that such practices were widespread across districts.

b.  **Specific Prior Incidents**: This custom is evidenced by multiple high-profile cases, including the Gun Trace Task Force (GTTF) scandal (2017-2018), where BPD officers, including Sgt. Wayne Jenkins, routinely fabricated affidavits, planted

evidence, and conducted false arrests, resulting in over 1,600 tainted convictions being vacated and the City paying over $20 million in settlements (e.g., *Burley v. Baltimore Police Dep't*, No. 1:18-cv-02835 (D. Md., settled for $8 million in 2020 for fabricated evidence)). Despite knowledge of these violations, BPD failed to implement reforms, allowing similar conduct to continue. Another example is *William James v. Jemell Rayam et al.* (Balt. City Cir. Ct. No. 24-C-18-001701, 2018; affirmed *Baltimore City Police Dep't v. Potts*, 468 Md. 265 (2020)), where officers planted a firearm, fabricated probable cause for arrest, leading to a $200,000 settlement (under high-low agreement) with no officer discipline. At least ten (10) similar lawsuits against BPD for false affidavits and arrests have been filed and settled since 2016, totaling over $50 million, yet BPD still fails to discipline involved officers or change its practices.

c. **Failure to Train and Supervise Amounting to Deliberate Indifference**: Despite the DOJ Report's findings, BPD has deliberately failed to train officers on Fourth Amendment requirements for probable cause, affidavit accuracy (e.g., avoiding false statements under oath), and the prohibition against submitting materially false statements in support of warrants, and the obligation to act when an officer knows material statements supporting legal process are false. The 2017 federal consent decree mandated training reforms, but independent monitors have reported ongoing noncompliance, with BPD's training and supervisory systems remaining inadequate in key areas in reports and assessments through at least 2023–2025, with monitoring work continuing into 2026. This failure is deliberate, as BPD was on notice from the DOJ Report, consent decree, and repeated lawsuits, yet chose not

to act, foreseeably leading to violations like those here, where Officer Deaton admitted falsity but refused correction, and Officers Craig and Cooper failed to intervene.

d. **Ratification Through Failure to Discipline**: BPD has a custom of ratifying unconstitutional conduct by failing to investigate or discipline officers for fabricating probable cause. For instance, in the GTTF cases, implicated officers faced no internal discipline until federal charges. Similarly, in a substantial majority of citizen complaints alleging false arrest since 2016, no discipline was imposed. Reports also document persistent backlogs and procedural issues in the disciplinary process, including expired cases and delays that have prevented discipline from being imposed on some officers. Here, upon information and belief, the Officer Defendants have not been disciplined for their conduct toward Mr. Greenberg, despite Deaton's sworn admission of falsity, constituting ratification by final policymakers (e.g., the BPD Commissioner).

22. These municipal policies/customs were the moving force behind the violations in this case, as the Officer Defendants acted pursuant to BPD's tolerated practices, knowing they would face no consequences. But for the City's deliberate indifference, including its failure, after regaining full control of BPD on January 1, 2023, to implement corrective supervision, retraining, or audit mechanisms addressing known deficiencies in probable cause documentation, Mr. Greenberg would not have suffered false arrest, detention without probable cause, or malicious prosecution.

* * *

9

23.    At all times relevant to this action, Mr. Greenberg was married to Sarah Everd ("Ms. Everd"). The parties have since divorced. Ms. Everd resided separately from Mr. Greenberg as of February 23–24, 2023.

24.    On the evening of February 23, 2023, Ms. Everd filed a Petition for Protective Order in the District Court of Maryland for Baltimore City. A temporary protective order was issued that same evening. The temporary order required Ms. Everd to reside at her mother's residence and permitted Mr. Greenberg to remain in the marital home. The temporary order did not authorize law enforcement to enter the residence absent service or further court process.

25.    The temporary protective order was never served on Mr. Greenberg before the events of February 24, 2023. Mr. Greenberg had no notice of any such order at the time of the civilian escort.

26.    On or about February 24, 2023, at approximately 1:50 a.m., Mr. Greenberg's then-wife (Ms. Everd) requested a non-emergency civilian standby from the Baltimore City Police Department to Mr. Greenberg's home at 1510 Park Avenue, Baltimore, Maryland 21217, to retrieve baby bottles and formula for the parties' thirteen (13) month-old child.

27.    Ms. Everd arrived at Mr. Greenberg's residence at approximately 2:00 a.m., accompanied by three (3) BPD Officers (the "Officer Defendants"), including Defendant Deaton. Mr. Greenberg was asleep in an upstairs bedroom when they arrived.

28.    Deaton's patrol vehicle was parked immediately in front of Mr. Greenberg's residence and was not running, and its lights were off. Conditions were reported as "very dark" when Ms. Everd and the officers arrived.

29.    Mr. Greenberg's residence is only accessible through a vestibule, which is at the top of seven (7) entryway steps. The front door opens into a small hallway, and a second interior

door must then be opened to access the inside of the home. The interior door contains a windowpane that allows visitors to see a partial view inside the residence from the vestibule.

30.    Ms. Everd, accompanied by the Officer Defendants, climbed the stairs and entered the vestibule, which Ms. Everd unlocked, but could not enter the home because Ms. Everd did not have those keys with her.

31.    Ms. Everd rang the doorbell and knocked on the front door to rouse Mr. Greenberg, who was still asleep upstairs. Despite receiving no response, Ms. Everd remained in the vestibule for several minutes with the Officer Defendants, periodically ringing the bell and knocking on the door.

32.    Several minutes after Ms. Everd first knocked on the door, Mr. Greenberg woke up and started walking downstairs to see what was causing the commotion.

33.    According to Defendant Deaton, Mr. Greenberg walked down the interior stairs and approached the vestibule while carrying a handgun in his left hand. Deaton then yelled out "gun," which caused Ms. Everd and the Officer Defendants to retreat down the front stairs.

34.    At all times relevant to this action, Mr. Greenberg was carrying his personal cellphone, which was being used as a flashlight. Mr. Greenberg did not carry a firearm on his person at any moment described or otherwise implicated herein.

35.    Neither Deaton nor any of the Officer Defendants recognized, due to their lack of training, that Mr. Greenberg was using his cellphone as a flashlight rather than brandishing a firearm.

36.    The Officer Defendants retreated down the stairway and drew their firearms. Ms. Everd was escorted away from the area shortly thereafter.

37.     Mr. Greenberg closed the exterior door, having no knowledge that several police officers were positioned in front of his home, or that Ms. Everd was attempting to access the home. Accordingly, Mr. Greenberg returned to his upstairs bedroom and went back to sleep.

38.     Defendant Deaton, however, reported that Mr. Greenberg aimed his firearm at the Officer Defendants and had barricaded himself inside his home. Deaton specifically told a fellow officer, while drafting her affidavit, that Mr. Greenberg "pointed the gun at us."

39.     Shortly after the Officer Defendants took up defensive positions around Mr. Greenberg's home, Defendant Cooper learned that Mr. Greenberg owned a law firm and reported that information to Defendants Craig and Deaton.

40.     Additional BPD officers were called to the scene, based on Deaton's report of an armed barricade, closing off the adjacent streets and positioning themselves around Mr. Greenberg's residence and the surrounding neighborhood. Additional officers continued to arrive over the next several hours, including tactical units and the SWAT team. By 4:00 a.m., a sniper had taken a position in a neighbor's home. Police presence continued to increase through approximately 6:00 a.m. on February 24, 2023, culminating with Mr. Greenberg's arrest.

41.     While additional BPD officers continued to surround Mr. Greenberg's home, Defendant Deaton was directed by a superior officer to obtain an arrest warrant for Mr. Greenberg. Officer Deaton's supervisor never asked whether probable cause existed to support an arrest warrant in the first place. To obtain the arrest warrant, Deaton prepared and submitted an Application for Statement of Charges. A true and correct copy of Officer Deaton's Application for Statement of Charges is attached hereto as **EXHIBIT 1**, at 4.

12

42.    When a law enforcement officer submits an Application for Statement of Charges, they must submit an affidavit containing factual averments from which a judicial officer determines whether probable cause exists to issue an arrest warrant.

43.    Deaton's affidavit stated, *inter alia*, "I observed a black handgun in his right hand and shouted 'gun.'" This contradicts Deaton's contemporaneous account that she saw the object in Mr. Greenberg's left hand.

44.    Deaton's affidavit continued: "When Mr. Greenberg approached the outer door, Officer Craig observed him raise his firearm and pointed at the officers while he closed the door." **EXHIBIT 1**, at 4.

45.    Deaton further averred, in a handwritten amendment to her affidavit, that "[o]fficers on scene felt as though Mr. Greenberg pointed the firearm at us in an effort to keep us away from his residence. Mr. Greenberg then barricaded himself inside the residence." **EXHIBIT 1**, at 4.

46.    There was no objective factual basis upon which Deaton or any officer could reasonably conclude that Mr. Greenberg had pointed a firearm at anyone, or that he had barricaded himself to prevent police entry. To the extent Deaton claimed she observed a 'handgun,' that assertion was materially false or made with reckless disregard for the truth because Mr. Greenberg was holding only his cellphone used as a flashlight.

47.    Officer Deaton only felt comfortable making these false averments because of the longstanding BPD custom of condoning unconstitutional conduct; specifically, submitting false statements in affidavits of probable cause and applications for statements of charges.

48.    Based on Deaton's affidavit, Mr. Greenberg was originally charged with four (4) criminal offenses:

    a.  First Degree Assault (felony);

b.  Second Degree Assault (misdemeanor[1]);

c.  Use of a Firearm in Commission of a Felony/Crime of Violence (misdemeanor);

d.  Handgun on Person (misdemeanor).

49.    Mr. Greenberg faced a maximum sentence of fifty-eight (58) years if convicted.

50.    Before Defendant Deaton returned to Mr. Greenberg's residence to execute the arrest warrant, Mr. Greenberg had learned about the developing police situation. Upon learning that the police had surrounded his home, believing him to be barricaded inside, Mr. Greenberg peacefully surrendered to BPD on the morning of February 24, 2023. Mr. Greenberg's surrender and arrest occurred publicly, in broad daylight, in front of his neighbors, peers, and other community members. News of his arrest, alleged barricade, and criminal charges were also shared publicly.

51.    Mr. Greenberg was then transported and held at the Baltimore Central Booking & Intake Center, located at 300 E. Madison Street, Baltimore, Maryland 21202.

52.    Mr. Greenberg's initial bail review was held on February 27, 2023, in the District Court of Maryland for Baltimore City. Mr. Greenberg was denied bail because of the sworn statements in Officer Deaton's Application for Statement of Charges; specifically, that Mr. Greenberg pointed a gun at BPD officers. Mr. Greenberg remained in pretrial custody as a proximate result of Officer Deaton's false allegations.

53.    On March 07, 2023, Mr. Greenberg appeared before the Honorable Judge Tameika Lunn for a hearing on the protective order issued between him and Ms. Everd. During the

---

[1]    Second Degree Assault is upgraded to a felony offense when "the person knows or has reason to know that the [victim] is: (i) a law enforcement officer engaged in the performance of the officer's official duties . . ." Md. Code Ann., Crim. Law § 3-203(c)(2) (West 2025). The charging decision is consistent with Mr. Greenberg's position that no firearm was pointed at an officer.

protective order hearing, Officer Deaton was called by Ms. Everd to testify to the events leading to Mr. Greenberg's arrest.

54.    During Defendant Deaton's direct examination, Deaton testified that "[a]s [Mr. Greenberg] came to the door, he raised his hand that had the gun to close the door." Judge Lunn later noted on the record that Officer Deaton did not testify that Mr. Greenberg ever *pointed* a firearm at either Ms. Everd or any of the Officer Defendants.

55.    When Defendant Deaton was questioned on cross-examination, the following exchange took place:

Q:    So the gun is in his right hand coming down the steps?

A.:    Correct.

Q:    The moment you see it in his right hand, you get everybody out of there?

A:    Correct.

Q:    So the moment he comes down the steps, **he's not pointing the gun at this point at all, is that correct?**

A:    **No, not at all.**

56.    Based on Defendant Deaton's testimony at the March 07, 2023, protective order hearing, Judge Lunn found, as a matter of fact, that:

> Because Officer Deaton has testified, he [Mr. Greenberg] has a wear and carry, he can have weapons, he was in his home, **the gun was not pointed at anyone,** people are knocking on his door at 2:33 a.m., he has a gun. But **there was no imminent threat that he was pointing it at anyone or going to harm anyone with that gun.**

57.    Defendant Deaton's testimony at the protective order hearing directly contradicted her averments in the Application for Statement of Charges, which explicitly stated that Mr. Greenberg "pointed [a firearm] at officers" and that "officers on scene felt as though Mr. Greenberg pointed the firearm at [them]." EXHIBIT 1, at 4. These allegations were essential for

establishing probable cause for Mr. Greenberg's arrest, but Defendant Deaton herself conceded, under oath, that these statements were untrue.

58.     Defendant Deaton's testimony, as well as Judge Lunn's findings, confirmed that the factual averments that were intentionally included in the Application for Statement of Charges—sworn to under the penalties of perjury—were materially false and did not occur as stated.

59.     On March 08, 2023, Mr. Greenberg's criminal defense counsel filed a Motion for Bail Review based on a change of circumstances, which summarized the issues with Officer Deaton's testimony as follows:

> Under oath, Officer Deaton testified that she saw the Defendant walk down the stairs with a firearm. Out of an abundance of caution, she alerted the other officers to retreat. **She further testified at no time did she observe the Defendant point a firearm**…A direct contradiction to the Statement of Probable Cause.
> . . .
> The Honorable Judge Lunn made a finding of fact that on the day of February 24, 2023, there was no assault by pointing of a firearm committed by the Defendant.

60.     Despite admitting under oath that she never observed Mr. Greenberg point a firearm at anyone, and notwithstanding Judge Lunn's identical finding of fact, Defendant Deaton intentionally refused to amend her Application for Statement of Charges against Mr. Greenberg. Therefore, Mr. Greenberg continued to be prosecuted for several admittedly frivolous charges, solely because of Deaton's (false) averments. Mr. Greenberg remained in pretrial custody as his case continued.

61.     Upon Defendant Deaton's sworn testimony contradicting the factual assertions in her affidavit, Baltimore City, through its policymakers and supervisory personnel, was placed on actual notice that the Application for Statement of Charges contained materially false statements.

16

62.    On information and belief, despite this notice, Baltimore City failed to initiate an internal investigation, failed to require correction of the affidavit, failed to notify prosecuting authorities of the falsity, and failed to discipline the involved officers.

63.    This failure to act in the face of known falsity constitutes ratification of the unconstitutional conduct and deliberate indifference to Mr. Greenberg's rights.

64.    At that point, Baltimore City possessed actual knowledge that a sworn probable cause affidavit submitted by one of its officers contained materially false statements necessary to sustain felony charges. The City nevertheless failed to require correction of the affidavit, failed to withdraw the warrant, failed to discipline the officer, and permitted the prosecution and indictment to proceed. Such inaction in the face of known falsity constitutes ratification of unconstitutional conduct by municipal policymakers.

65.    At the time of his arrest, Mr. Greenberg was the managing member and sole proprietor of the Greenberg Law Firm, which was commercially successful and operated for approximately ten (10) years before this incident.

66.    As a proximate result of his frivolous arrest, fraudulent charges, and baseless prosecution, Mr. Greenberg could not manage his business affairs, tend to sensitive legal matters, speak with clients, or otherwise perform any of the functions necessary for the continued operation of his business.

67.    Additionally, Defendant Deaton learned that Mr. Greenberg was a practicing attorney before she submitted her affidavit in support of charges. In fact, Deaton researched Mr. Greenberg while sitting outside his house during the "barricade" and, in doing so, recorded herself asking, "How can this guy be a lawyer?"

68.     Despite knowing the existential threat to Mr. Greenberg's business and professional endeavors and that the pending charges existed solely because of her (false) averments, Defendant Deaton refused to amend her affidavit or application to reflect the truth. Thus, the Baltimore City State's Attorney's Office maintained its prosecution and conferred a grand jury to indict Mr. Greenberg for additional charges.

69.     On information and belief, Defendant Deaton presented the same materially false factual narrative to the grand jury that she had included in her Application for Statement of Charges, thereby perpetuating the false allegations that formed the basis of the indictment.

70.     On March 23, 2023, Mr. Greenberg was indicted on thirteen (13) criminal offenses because of the grand jury proceedings:

1. First Degree Assault (felony);

2. First Degree Assault;

3. First Degree Assault;

4. Second Degree Assault (misdemeanor);

5. Second Degree Assault;

6. Second Degree Assault;

7. Reckless Endangerment (misdemeanor);

8. Reckless Endangerment;

9. Reckless Endangerment;

10. Reckless Endangerment;

11. Use of a Firearm in Commission of a Felony/Crime of Violence (misdemeanor);

12. Use of a Firearm in Commission of a Felony/Crime of Violence; and

13. Use of a Firearm in Commission of a Felony/Crime of Violence.

71.    Mr. Greenberg faced a maximum sentence of 158 years if convicted of charges predicated exclusively on Defendant Deaton's sworn misrepresentations.

72.    The subsequent indictment would not have been issued but for Defendant Deaton's false allegations in her affidavit, which led to Mr. Greenberg's arrest and criminal charges in the first place. A reasonable officer in Defendant Deaton's position would foresee that submitting false allegations in an application for statement of charges—especially allegations as serious as felony assault—would prompt further judicial proceedings concerning those allegations, including but not limited to a subsequent indictment. Therefore, all harm caused by the subsequent indictment remains causally attributable to the Defendants.

73.    The indictment was predicated on the same materially false factual allegations originally submitted by Defendant Deaton in her Application for Statement of Charges, and no independent evidence existed to support the indictment.

74.    On March 28, 2023, Mr. Greenberg was released from confinement and placed on home detention, but the harm was not over. Mr. Greenberg incurred additional damages relating to his home detention, including but not limited to wearing and paying for an ankle monitor, having his freedom of movement restricted, and returning to a neighborhood of his peers who believed that he had assaulted multiple law enforcement officers. By that point, the damage to his personal and professional interests was already done. The threat of 158 years of incarceration was already public knowledge, and the mass exodus of his clientele had already occurred. Meanwhile, the felony prosecution caused by Defendant Deaton's false allegations continued.

75.    Mr. Greenberg's frivolous prosecution caused his business to lose multiple clients and suffer extreme reputational harm. Several of Mr. Greenberg's most significant clients stated that they could tolerate a brief interruption to Mr. Greenberg's services, but not a prolonged

absence, let alone one due to a multi-felony prosecution. Mr. Greenberg lost significant clientele and their professional goodwill because of the false charges. Other potential clients had learned of Mr. Greenberg's situation, including his loss of clientele, and avoided doing business with his firm, despite previously committing to a working relationship. As explained more fully *supra*, Mr. Greenberg was ultimately forced to sell his business for pennies on the dollar to ensure that his existing clients received the necessary and time-sensitive legal counsel they, and the ethics rules, required.

76.    Mr. Greenberg would not have sold his business, let alone at such a deeply undervalued rate, but for the false allegations in Defendant Deaton's affidavit. A reasonable officer in Deaton's position would foresee that filing false allegations of felonious criminal activity would severely harm the personal and professional reputation of the person being charged and impede that person's ability to engage in their professional pursuits.

77.    It was not until July 26, 2023—five months after his wrongful arrest—that the Baltimore City State's Attorney's Office finally dismissed the charges against Mr. Greenberg by entering a nolle prosequi on all counts. In the end, Mr. Greenberg did not receive any criminal or civil penalties due to the events of February 24, 2023—he was completely exonerated. Unfortunately, the damage was already done.

78.    Mr. Greenberg's life was forever damaged by these events, which occurred solely because of the acts and/or omissions of Defendant Deaton and Defendant Baltimore City, through no fault of his own.

79.    Mr. Greenberg was also forced to incur high legal costs to defend the prosecution initiated by Defendant Deaton's fraudulent affidavit.

80.     At all times relevant to this action, Defendant Deaton was operating within the scope of her employment with Baltimore City and in furtherance of her official duties therein.

81.     As is explained more fully *infra*, Defendant Baltimore City is also directly liable for the damage done to Mr. Greenberg due to, *inter alia*, its longstanding pattern and/or practice of unconstitutional conduct, specifically with respect to fraudulent charging documents.

82.     At all times relevant to this action, Defendant Officer Deaton, the Officer Defendants, and Defendant Baltimore City were state actors and "persons" within the meaning of 42 U.S.C. § 1983.

## COUNT I
### 42 U.S.C. § 1983 –FOURTH AMENDMENT: UNLAWFUL ARREST
### (All Defendants)

83.     Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

84.     Mr. Greenberg was arrested by Defendant Deaton, the Officer Defendants, acting as BPD officers, on February 24, 2023.

85.     The Fourth Amendment of the United States Constitution requires that all arrests must be supported by probable cause that a crime has been, or is about to be, committed.

86.     No reasonably competent officer could conclude that probable cause existed for any of the offenses charged.

87.     Mr. Greenberg was/is properly licensed to possess and carry certain firearms, including but not limited to the type of handgun that Defendant Deaton alleged in her Application for Statement of Charges. Mr. Greenberg was legally permitted under Maryland and federal law to possess firearms, and he was properly licensed under Maryland law to wear, carry, and transport

a handgun. Even if he had been holding a firearm inside his own home, that fact alone would not establish probable cause for the offenses charged.

88.    Moreover, Defendant Deaton admitted under oath, and Judge Lunn found as a matter of fact, that Mr. Greenberg never pointed a firearm at any of the Officer Defendants or Ms. Everd on the morning of February 24, 2023.

89.    As such, Defendant Officer Deaton and the Officer Defendants lacked a sufficient factual basis, if any, for arresting Mr. Greenberg. Mr. Greenberg's arrest was predicated on the fraudulent allegations contained in Defendant Deaton's Application for Statement of Charges. A reasonable and properly trained police officer in Defendant Deaton's position would know that Mr. Greenberg did not violate any criminal laws on the morning of February 24, 2023.

90.    Defendant Deaton was not entitled to rely on the warrant issued for Mr. Greenberg's arrest, as Deaton knew, at all relevant times, that the affidavit in support of that warrant was predicated on false allegations that she herself had fabricated. In other words, Defendant Deaton possessed actual knowledge that Mr. Greenberg's arrest warrant was only issued under fraudulent pretexts.

91.    All charges brought against Mr. Greenberg relating to this action were dropped, and he was not found guilty of a single charge. Additionally, Mr. Greenberg has not been re-charged for any of the events of February 24, 2023.

92.    Officer Deaton and the Officer Defendants' conduct was the moving force behind Mr. Greenberg's unlawful deprivation of freedom, thereby causing him to suffer physical, financial, and emotional injuries through no fault of his own, including but not limited to the collapse of his privately held company, the Greenberg Law Firm.

93.     At all times relevant, it was clearly established that a law enforcement officer violates the Fourth Amendment by deliberately or recklessly including materially false statements in a probable cause affidavit that are necessary to the finding of probable cause.

94.     It was further clearly established that an officer may not rely upon a warrant she herself obtained through knowing falsification of material facts. No reasonable officer in Defendant Deaton's position could have believed it was lawful to submit materially false statements to secure an arrest warrant.

95.     The Greenberg Law Firm was a well-established and commercially profitable company by the time of the events complained of herein. The Greenberg Law Firm operated for approximately ten (10) years before the events of February 24, 2023. Financial evaluations indicate that the Greenberg Law Firm would have, more likely than not, continued to remain profitable but for the Defendants' misconduct as alleged herein.

96.     Based on historical revenue, profitability, and projected growth of the Greenberg Law Firm, Mr. Greenberg's economic losses resulting from the forced sale of his business and loss of future income are reasonably estimated to exceed Ten Million Dollars ($10,000,000).

97.     But for the Mr. Greenberg's false arrest as described herein, Mr. Greenberg would have been able to appropriately manage his business affairs, avoid losing clientele, and continue operating the Greenberg Law Firm.

98.     A reasonable law enforcement officer in Officer Deaton and the Officer Defendants' respective positions would foresee that falsely arresting a known business owner would deprive the arrestee of their ability to manage their business affairs, thereby imposing an existential threat to their business.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution, the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

## COUNT II
### 42 U.S.C. § 1983 – *Monell* Liability
### (Defendant Mayor and City Council of Baltimore)

99.    Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

100.    At all relevant times herein, Baltimore City, acting through its police department and final policymakers, was a state actor and 'person' within the meaning of 42 U.S.C. § 1983, and its conduct was/is subject to the same.

101.    Defendant Baltimore City has engaged, and continues to engage, in a custom, pattern, and/or practice that violates the Fourth Amendment of the United States Constitution.

102.    The policies, customs, and practices described herein were maintained, implemented, ratified, or deliberately ignored by Baltimore City's final policymakers, including the Police Commissioner, who possessed final authority over arrest procedures, affidavit review, officer discipline, and training standards.

103.    BPD maintains a widespread custom of officers submitting false, misleading, or unverified statements in probable cause affidavits and charging documents, and of supervisors approving warrant applications without meaningful factual verification. Baltimore City's final policymakers have been on notice of these practices yet failed to implement adequate training, supervision, auditing, or discipline, reflecting deliberate indifference.

24

104.    BPD's culture of impunity, rooted in deficient training, supervision, and discipline, reflects deliberate indifference to the constitutional rights of Baltimore City residents, including Mr. Greenberg. BPD's culture also emboldened Defendant Deaton to submit her fraudulent affidavit, knowing similar fabrications had gone unpunished for years.

105.    From November 2010 through July of 2015, supervisors at the Central Booking & Intake Center released 6,736 arrestees without charges. During this same time period, prosecutors from the Baltimore City State's Attorney's Office declined to charge 3,427 additional arrestees and, in doing so, explicitly found that 1,983 of the underlying arrests lacked probable cause. In sum, Baltimore City Police Officers made 10,163 arrests that authorities immediately determined did not merit prosecution—an average of roughly 200 arrests per month. *Investigation of the Baltimore City Police Department*, U.S. DEP'T OF JUST. CIV. RTS. DIV., at 35 (Aug. 10, 2016). Subsequent public reports and consent decree monitoring have continued to identify deficiencies in probable cause documentation and supervisory review.

106.    In 2016, the United States Department of Justice ("DOJ") opened an investigation into the Baltimore City Police Department. After an extensive investigation into the Baltimore City Police Department's conduct from 2010 through May of 2016, the DOJ concluded:

> BPD engages in a pattern or practice of conduct that implicates [the DOJ's] statutory authority. The pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity, leading directly to a broad spectrum of constitutional and statutory violations. . . . This pattern or practice is also manifested in several ways that violate specific constitutional and statutory provisions: (1) BPD stops, searches, and arrests individuals on Baltimore streets without the reasonable suspicion or probable cause required by the Fourth Amendment.

*Investigation of the Baltimore City Police Department*, U.S. DEP'T OF JUST. CIV. RTS. DIV., at 21–22 (Aug. 10, 2016).

107.    Defendant Baltimore City specifically agreed with the results of the DOJ investigation. *See Agreement in Principle Between the United States and the City of Baltimore Regarding the Baltimore City Police Department*, U.S. DEP'T OF JUST. CIV. RTS. DIV. (Aug. 09, 2016).

108.    Despite the consent decree and subsequent reforms, BPD final policymakers, including the Police Commissioner, have received ongoing monitoring reports but maintained only partial compliance in key areas, demonstrating deliberate indifference to persistent probable cause failures.

109.    The Gun Trace Task Force (GTTF) scandal exemplifies this pattern: Multiple officers, including Wayne Jenkins and Momodu Gondo (indicted in 2017), routinely filed false affidavits claiming probable cause for searches and arrests, often planting evidence. This resulted in over $22.9 million in settlements by 2025 for at least 41 victims, including $8 million in 2020 to victims like Umar Burley and Maurice Ward for planted evidence leading to false convictions. BPD leadership ignored red flags from 2015-2017, with no broader audits or discipline sufficient to eradicate the custom.

110.    In late 2016, BPD arrested Mr. Albert Brown based on the allegation that Mr. Brown had unlawfully possessed a firearm. In 2020, the City settled the claim brought by Mr. Brown after it was determined that BPD Officers had fabricated the allegations of Mr. Brown's firearm possession. *See Police Misconduct Litigation Report*, BALT. CTY. L. DEP'T., at 7 (July 30, 2025) (citing *Albert Brown v. Wayne Jenkins, et al.*, 20-CV-00971 (D. Md. 2020)).

111.    In 2018, BPD arrested and charged Mr. Yusuf Smith based on the allegation that Mr. Smith had reached into his waistline and tossed a firearm onto the ground. In 2020, the City settled the claim brought by Mr. Smith, after it was determined that BPD Officer Michael

O'Sullivan had fabricated the allegations of Mr. Smith's firearm possession. *See Police Misconduct Litigation Report*, BALT. CTY. L. DEP'T., at 8 (July 30, 2025) (citing *Yusuf Smith v. Michael O'Sullivan*, 24-C-002819 (Md. Circuit Ct. 2020)).

112.    Also in 2018, BPD Officers arrested and charged Ms. Henrietta Middleton based on fabricated allegations contained in charging documents. The City was found liable for Ms. Middleton's false arrest in late 2020. *See Police Misconduct Litigation Report*, BALT. CTY. L. DEP'T., at 9 (July 30, 2025) (citing *Henrietta Middleton v. Baltimore Police Department, et al.*, 20-CV-03536 (D. Md. 2020)). This false arrest disrupted Ms. Middleton's business, putting BPD on notice that fabricated charges harm professionals' reputations and livelihoods.

113.    In 2019, BPD falsely arrested and charged Mr. Kenyon Joyner based on fabricated allegations contained in charging documents. In 2022, the City settled the claim brought by Mr. Joyner. *See Police Misconduct Litigation Report*, BALT. CTY. L. DEP'T., at 10 (July 30, 2025) (citing *Kenyon Joyner v. State of Maryland, et al.*, 24-C-21-003293 (D. Md. 2021)).

114.    Also in 2019, former BPD Sgt. Ethan Newberg falsely claimed in arrest reports that bystanders Lee Dotson and Charles Kuniken were interfering with arrests, leading to their wrongful detentions. Body-worn camera footage contradicted Newberg's accounts—e.g., showing Dotson calmly leaving the scene before being pursued and grabbed, and Kuniken merely inquiring about medical attention for another arrestee. The City settled the resulting federal lawsuits for $575,000 in October 2023 ($287,500 each), after Newberg pleaded guilty earlier that year to misconduct in office stemming from a pattern of unjustified arrests and false reporting. *See* Baltimore City Board of Estimates Agenda (Oct. 4, 2023); Police Funding Database (Thurgood Marshall Institute, updated 2025); Baltimore City Law Department Police Misconduct Litigation Report (various eds., including July 2025). This case highlights BPD's failure to adequately

supervise, train, or discipline officers for fabricating details in arrest documentation, allowing such conduct to persist.

115.    In 2020, the Baltimore City Police Department falsely arrested Mr. Zayne Abdullah based on fraudulent allegations that Mr. Abdullah had assaulted Sergeant Welton Simpson Jr. Sergeant Simpson was charged and convicted of making a false statement to a law enforcement officer and misconduct in office. On appeal, the Appellate Court of Maryland affirmed Sergeant Simpson's conviction and held that "Simpson deliberately and intentionally made false statements at the scene of the encounter. These false statements were material, and they were made with both the intent and the purpose of causing the police to arrest and charge Mr. Abdullah." *Simpson v. State*, 2023 WL 414947, at *6 (2021) (unreported). Despite this, BPD did not implement department-wide retraining on affidavit integrity until 2024, showing deliberate indifference.

116.    In 2021, BPD falsely arrested Adam Litchfield in response to a reported domestic dispute at his home. Mr. Litchfield was not convicted of the charges filed, and he then sued the reporting BPD Officer. In 2024, the City settled the claim for false arrest brought by Mr. Litchfield. *See Police Misconduct Litigation Report*, BALT. CTY. L. DEP'T., at 10 (July 30, 2025) (citing *Adam Litchfield v. Ronald Rinehart, et al.*, 21-CV-02101 (D. Md. 2021)). Discovery revealed supervisory approval of the false domestic dispute report without verification, exemplifying inadequate oversight.

117.    In recent years, BPD officers have continued to engage in similar misconduct. For example, in February 2026, Officer Mamoudou Diallo pleaded guilty in Baltimore Circuit Court to misconduct in office after falsely arresting the father of a domestic violence survivor's children by accusing the survivor of lying about her abuser's identity. This false arrest stemmed from inaccurate and misleading reporting, highlighting persistent failures in training and supervision on

probable cause and accurate incident documentation. *See* Dylan Segelbaum, *Baltimore Police Officer Pleads Guilty to Misconduct After Making False Arrest*, THE BALTIMORE BANNER (Feb. 5, 2026).

118.    Likewise, the City's approval of a $14 million settlement to Gary Washington—who spent decades imprisoned for a 1986 murder conviction—further demonstrates the longstanding and unremedied pattern of fabricating evidence and manipulating witness statements to support probable cause and convictions. Washington's conviction was vacated after a key witness recanted and alleged police coercion; he was later released, and the settlement approved in January 2026 resolved his federal civil rights lawsuit against BPD. *See* Mike Hellgren, *Baltimore Pays $14 Million to Wrongfully Convicted Man who Spent 31 Years in Prison*, CBS NEWS (Jan. 7, 2026); *Gary Washington, Who Spent 30 Years in Prison for a Crime he Didn't Commit, Receives $14 Million Settlement from the City of Baltimore*, LOEVY & LOEVY (Jan. 7, 2026).

119.    In each of the foregoing examples, BPD officers fabricated or materially misrepresented facts in sworn charging documents, arrest reports, or probable cause statements to manufacture legal justification for arrest and prosecution.

120.    Unfortunately, the foregoing examples are far from an exhaustive inventory of the history of false arrests and fraudulent allegations made by BPD Officers. Many such instances never result in formal legal proceedings and are therefore beyond the realm of public knowledge/access. On information and belief, the discovery process will reveal additional instances of Baltimore City's unconstitutional patterns or practices as they relate to unlawful arrests based on fraudulent charging affidavits.

121.    On February 24, 2023, Mr. Greenberg's wrongful arrest became merely another instance among a longstanding history of unconstitutional conduct by Defendant Baltimore City.

122.    Officer Deaton, at all times relevant to this action, was acting under the color of state law and as an agent and officer of Defendant Baltimore City by and through the Baltimore City Police Department.

123.    Defendant Baltimore City authorized Defendant Officer Deaton to act in furtherance of the goals and functions of the Baltimore City Police Department at all times relevant to this action, including but not limited to February 24, 2023.

124.    At the time of Officer Deaton's dispatch to Mr. Greenberg's residence, Defendant Baltimore City had instituted and maintained a custom and practice of prioritizing warrant procurement and arrest processing over meaningful constitutional verification of probable cause, including tolerating materially false or unverified statements in sworn charging documents.

125.    In Mr. Greenberg's case specifically, Defendant Deaton was ordered by a superior officer to obtain a warrant for Mr. Greenberg's arrest. The superior officer did not inquire into exactly what charges, if any, were called for based on Mr. Greenberg's actual conduct. Deaton likewise failed to report the truth of the matter to her supervising officer. Deaton was simply ordered to obtain an arrest warrant, and she complied without conducting further factual verification.

126.    The unconstitutional customs and practices described herein were the moving force behind the constitutional violations suffered by Mr. Greenberg. Supervisory personnel instructed Officer Deaton to obtain an arrest warrant without first ensuring that probable cause existed, consistent with a departmental custom of prioritizing warrant procurement over constitutional verification.

127.    Baltimore City failed to require meaningful supervisory verification of factual assertions contained in probable cause affidavits, failed to audit affidavit accuracy, and failed to discipline officers who submitted false charging documents.

128.    Because officers who fabricated probable cause historically faced little or no discipline, Officer Deaton reasonably believed that submitting materially false statements would not result in adverse consequences.

129.    Judicial officers relied upon the false averments in denying bail and permitting continued prosecution. The grand jury proceedings were predicated on the same materially false factual narrative. Absent those false statements, Mr. Greenberg would not have been arrested, detained, or indicted.

130.    But for Defendant Baltimore City's unconstitutional pattern, practice, and/or custom of unlawful arrests based on false allegations, Mr. Greenberg would not have been falsely arrested on February 24, 2023. A reasonable municipality in Defendant Baltimore City's position would foresee that allowing an unconstitutional pattern, practice, and/or custom of arrests based on fabricated allegations would lead to the unlawful arrest of Baltimore City citizens, including but not limited to Mr. Greenberg.

131.    The policies and customs of Baltimore City were, therefore, the moving force behind the constitutional violations suffered by Mr. Greenberg.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution, the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

## COUNT III
### ARTICLE 26 OF THE MARYLAND DECLARATION OF RIGHTS: UNLAWFUL ARREST
### (All Defendants)

132.   Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

133.   Article 26 of the Maryland Declaration of Rights is interpreted *in pari materia* with the Fourth Amendment of the United States Constitution. Article 26 therefore requires that all arrests may only be warranted upon probable cause that a crime has been, or is about to be, committed.

134.   Defendant Officer Deaton and the Officer Defendants knew or should have known that there was not probable cause to support a warrant for Mr. Greenberg's arrest and prosecution.

135.   By fabricating the allegations against Mr. Greenberg, Defendant Officer Deaton and the Officer Defendants intentionally deprived him of his right to be arrested only upon a showing of probable cause, thereby violating Article 26 of the Maryland Declaration of Rights.

136.   Defendant Officer Deaton and the Officer Defendants' conduct was a proximate cause of Mr. Greenberg's unlawful arrest, as well as the foreseeable consequences that followed, as outlined herein.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution, the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

<u>**COUNT IV**</u>
**ARTICLE 26 OF THE MARYLAND DECLARATION OF RIGHTS: *LONGTIN* LIABILITY**
**(Defendant Mayor and City Council of Baltimore)**

137.   Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

138.   At all times relevant to this action, Defendant Baltimore City was engaged in a pattern or practice that violates the Maryland State Constitution, specifically Article 26 of the Maryland Declaration of Rights.

139.   As explained, the Baltimore City Police Department has a thoroughly documented history of unlawful arrests and fraudulent charging affidavits since at least 2010. *See* Paragraphs 103–120 *supra*.

140.   But for Defendant Baltimore City's unconstitutional pattern or practice, Mr. Greenberg would not have suffered the aforementioned physical, financial, and mental injuries.

141.   A reasonable municipality in Baltimore City's position would understand that engaging in an unconstitutional pattern or practice would violate the constitutional rights held by the people of Maryland, including but not limited to Mr. Greenberg, especially in the context of unlawful arrests and fraudulent charging affidavits specifically.

142.   As such, Defendant Baltimore City's conduct was a proximate cause of Mr. Greenberg's unlawful arrest, as well as the foreseeable consequences that followed, as outlined herein.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution,

the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

## COUNT V
### ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS
### (All Defendants)

143.    Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

144.    Article 24 of the Maryland Declaration of Rights provides that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or existed, or, in any manner, destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or by the Law of the land." Article 24 of the Maryland Declaration of Rights is interpreted *in pari materia* with the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

145.    Defendants violated Article 24 of the Maryland Declaration of Rights by imprisoning and disseizing Mr. Greenberg of his "freehold, liberties, or privileges" without adequate justification (probable cause) and without the "judgment of his peers, or by the Law of the land."

146.    Article 24 further prohibits the government from continuing to deprive a person of liberty or property through criminal proceedings after municipal actors obtain actual knowledge that the factual basis supporting those proceedings is materially false.

147.    But for the Defendants' violation of Article 24, Mr. Greenberg would not have incurred the physical, financial, and mental injuries described herein.

148.    A reasonable actor in the Defendants' respective positions would foresee that submitting fraudulent allegations to obtain felony charges against Mr. Greenberg would deprive

him of his life, liberty, or property without the process for which he was due as a law-abiding citizen.

149.    As such, Defendants' conduct was a proximate cause of Mr. Greenberg's unlawful arrest, as well as the foreseeable consequences that followed, as outlined herein.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution, the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

## COUNT VI
### NEGLIGENCE
### (All Defendants)

150.    Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

151.    Defendant Officer Deaton and the Officer Defendants owed a duty of care to Mr. Greenberg to avoid engaging in unreasonable and unjustifiable conduct that would cause harm to Mr. Greenberg's legal, proprietary, and/or liberty interests.

152.    Defendant Officer Deaton and the Officer Defendants breached this duty by submitting materially false statements and failing to exercise reasonable care in verifying the factual accuracy of sworn charging documents, which the Defendants knew or should have known would harm Mr. Greenberg's legal, proprietary, and/or liberty interests.

153.    But for the Defendants submitting a fraudulent charging affidavit, Mr. Greenberg would not have suffered the legal, proprietary, and/or liberty injuries described herein.

154.    A reasonable law enforcement officer in Officer Deaton and the Officer Defendants' respective positions would foresee that submitting false allegations to obtain felony charges against Mr. Greenberg would cause harm to his legal, proprietary, and/or liberty interests.

155.    Officers Craig and Cooper knew, or consciously disregarded, that Mr. Greenberg had not pointed a firearm at them and nonetheless assisted in executing an arrest predicated on materially false statements.

156.    As such, the Officer Defendants' conduct is a proximate cause of Mr. Greenberg's harms as described herein.

157.    At all times relevant to this action, Defendant Officer Deaton and the Officer Defendants were operating within the scope of their official duties as officers of the Baltimore City Police Department. Defendant Baltimore City is therefore vicariously liable for the Defendants' conduct via *respondeat superior*.

158.    Said injuries were caused by the gross negligence and/or actual malice of Defendant Officer Deaton and the Officer Defendants, absent any contributory negligence on the part of Mr. Greenberg.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution, the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

## COUNT VII
### NEGLIGENT TRAINING, SUPERVISION, AND/OR DISCIPLINE
**(Defendant Mayor and City Council of Baltimore)**

159.    Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

160.    At all times relevant to this action, Defendant Baltimore City had a duty to properly hire, train, and supervise the officers of the Baltimore City Police Department.

161.    As explained more fully *supra*, Baltimore City Police Officers continue to engage in a longstanding pattern or practice of unconstitutional conduct. This degree of unconstitutional conduct would not occur if Defendant Baltimore City was properly hiring, training, and/or supervising its police officers.

162.    More specifically, Defendant Baltimore City fails to train its police officers on, *inter alia*, how to identify probable cause, how to identify the presence of a firearm, how to identify when a crime has been committed, and how to properly submit an affidavit in Application for Statement of Charges.

163.    On information and belief, Defendant Baltimore City hires candidates that it knows or should know to be unfit for the duties of a police officer, including but not limited to the responsibilities described *supra*.

164.    On information and belief, Defendant Baltimore City fails to properly supervise its police officers in the process of obtaining arrest warrants and criminal charges as described more fully *supra*.

165.    But for Defendant Baltimore City's negligent training, supervision, and/or discipline of its police officers, Mr. Greenberg would not have suffered the physical, financial, and/or mental injuries described herein.

166.    A reasonable municipality in Defendant Baltimore City's position would foresee that negligently hiring, training, and supervising its police force would cause injury to the people of Baltimore City, Maryland, including but not limited to Mr. Greenberg.

167.    As such, Defendant Baltimore City's conduct is a proximate cause of Mr. Greenberg's false arrest, as well as the foreseeable consequences that followed, as outlined herein.

168.    Said injuries were caused by the negligence of Defendant Baltimore City, absent any contributory negligence on the part of Mr. Greenberg.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution, the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

## COUNT VIII
### FALSE LIGHT
### (All Defendants)

169.    Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

170.    Defendants caused the circumstances and charges of Mr. Greenberg's arrest to be publicized to third parties and the public by (i) filing and maintaining sworn charging documents and statements of probable cause accusing Mr. Greenberg of pointing a firearm at police officers; (ii) initiating and executing an early-morning tactical response, neighborhood lockdown, and arrest that occurred in public view; and (iii) setting in motion the creation and dissemination of public records and court proceedings reflecting the false allegations.

171.    As a direct and foreseeable result of Defendants' conduct, the circumstances of Mr. Greenberg's arrest—including the early-morning police presence, street closures, tactical units, public surrender, and filing of felony charges—were widely disseminated through public charging documents, court proceedings, media reporting, and community awareness, including among Mr. Greenberg's neighbors, clients, and professional associates. Upon information and belief, the false allegations appeared in publicly accessible records of the criminal proceedings and were reported or republished by third parties following Defendants' initiation of the criminal process.

172.    The specific allegation that Mr. Greenberg aimed or pointed a firearm at police officers was communicated to the public through those charging documents and related public proceedings and was understood and relied upon by members of the community, clients, and professional associates as an accusation of violent felonious conduct.

173.    A reasonable person would be highly offended if the general public were informed that they committed criminal acts that, in fact, were never committed at all. The public broadcasting of Mr. Greenberg's decidedly fictitious criminal activity would be even more offensive to Mr. Greenberg's clientele, thereby exacerbating the harm to Mr. Greenberg.

174.    Mr. Greenberg did not, in fact, commit the criminal acts that Defendant Officer Deaton and the Officer Defendants alleged.

175.    At all times relevant to this action, Defendant Officer Deaton and the Officer Defendants knew or should have known that Mr. Greenberg never committed any criminal offense on the morning of February 24, 2023. Officer Deaton and the Officer Defendants acted with knowledge of the falsity of the statements included in her affidavit in Application for Statement of Charges or, at the barest minimum, acted with reckless disregard for the truth of those statements.

176.    As a proximate result of the Defendants' conduct, Mr. Greenberg was caused to suffer great indignity to his personal and professional reputations regarding allegations that were decidedly untrue. Mr. Greenberg was caused, and will continue to be caused, to be associated with extremely serious allegations, thereby causing him to experience economic and non-economic damages.

177.    Defendant Officer Deaton and the Officer Defendants were acting within the scope of their official duties with the Baltimore City Police Department at all times relevant to this action. Defendant Baltimore City is therefore vicariously liable for the Defendants' conduct via *respondeat superior*.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution, the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

### COUNT IX
**MALICIOUS PROSECUTION**
**(All Defendants)**

178.    Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

179.    Defendants initiated criminal proceedings against Mr. Greenberg due to the events of February 24, 2023.

180.    The criminal proceedings were initiated and maintained based solely on Defendant Deaton's sworn statements.

181.    The criminal proceedings initiated against Mr. Greenberg were fully and finally resolved in his favor, as all counts were eventually dismissed by the State of Maryland (voluntarily).

182.    As explained more fully *supra*, Defendants lacked probable cause to initiate criminal proceedings against Mr. Greenberg.

183.    Defendants acted with actual malice. Defendant Deaton knowingly submitted materially false statements in a sworn charging document and persisted in those allegations despite admitting under oath that the underlying facts did not occur as stated. Defendants continued to pursue prosecution despite knowledge of falsity, demonstrating an improper purpose and reckless disregard for Mr. Greenberg's rights.

184.    As a proximate result of the Defendants' conduct, Mr. Greenberg was caused to suffer great indignity to his personal and professional reputations regarding allegations that were decidedly untrue. Mr. Greenberg was caused, and will continue to be caused, to be associated with extremely serious allegations, thereby causing him to experience conscious pain and suffering.

185.    Defendant Officer Deaton and the Officer Defendants were acting within the scope of their official duties with the Baltimore City Police Department at all times relevant to this action. Defendant Baltimore City is therefore vicariously liable for the Defendants' conduct via *respondeat superior*.

**WHEREFORE**, Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for defending the underlying prosecution, the financial loss incurred by the forced sale of the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

## COUNT X
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (All Defendants)

186.    Plaintiff adopts and incorporates by reference the preceding Paragraphs with the same force and effect as if fully set forth herein.

187.    Defendants intentionally and willfully filed a fraudulent affidavit in support of statement of charges against Mr. Greenberg on February 24, 2023.

188.    Defendants filed said affidavit despite possessing actual and/or constructive knowledge of Mr. Greenberg's status as a successful business owner.

189.    As explained more fully *supra*, Defendants lacked probable cause to initiate criminal proceedings against Mr. Greenberg. Therefore, Defendants did not possess the right or justifiable cause to interfere with Mr. Greenberg's business affairs, both current and prospective.

190.    Mr. Greenberg suffered actual damages as a proximate result of the Defendants' conduct. As explained more fully *supra*, Mr. Greenberg was forced to sell his business at a price significantly below its fair market value and, in doing so, Mr. Greenberg was deprived of the future revenue which he reasonably would have received had he still possessed his previous interest in the business.

191.    Defendant Officer Deaton and the Officer Defendants were acting within the scope of their official duties with the Baltimore City Police Department at all times relevant to this action. Defendant Baltimore City is therefore vicariously liable for the Defendants' conduct via *respondeat superior*.

**WHEREFORE**, this suit is brought, and Plaintiff hereby demands judgment against the Defendants, jointly and severally, in an amount exceeding Seventy-Five Thousand Dollars (>$75,000.00) in compensatory damages, including but not limited to legal fees incurred for

defending the underlying prosecution, the financial harm to the Greenberg Law Firm, and all other damages identified herein, plus interests and costs, as well as other damages and relief as permitted by law.

Respectfully submitted,

FURMAN | HONICK LAW

Allen E. Honick, Bar No.: 19822
Dustin C. Furman, Bar No.: 19986
10045 Red Run Boulevard, Suite 170
Owings Mills, Maryland 21117
P: (410) 844-6000
F: (410) 705-5651
allen@fhjustice.com
dustin@fhjustice.com
*Counsel for Plaintiff, Joshua Greenberg*

## JURY TRIAL DEMAND

Plaintiff hereby demands that this case be tried before a jury on all issues so triable.

Allen E. Honick, Bar No.: 19822